**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

LOFTHOUSE MANUFACTURING LTD.    :
    :
    :
v.    :    Civil No. CCB-15-3821
    :
    :
PORTS AMERICA BALTIMORE, INC.    :

**MEMORANDUM**

Lofthouse Manufacturing Ltd. ("Lofthouse") and Brawo Brassworking Limited ("Brawo") have sued Ports America Baltimore, Inc. ("PAB") and Ports America Chesapeake, LLC ("PAC"), alleging that the defendants' negligence in transferring the plaintiffs' cargo to a truck caused $500,000 in damages. The defendants—who argue that the case is barred, or their liability limited, by the Carriage of Goods by Sea Act ("COGSA") or the Baltimore Marine Terminal Association ("BMTA") Schedule—have filed motions to dismiss or, in the alternative, for summary judgment. Oral argument was heard on July 11, 2016, and supplemental briefing followed. For the reasons that follow, the first motion to dismiss or, in the alternative, for summary judgment will be denied as moot, and the second motion will be granted in part and denied without prejudice in part.

**BACKGROUND**

In or about November 2015, an LH electrical cabinet ("cabinet" or "machine") owned by Lofthouse and Brawo was transported from Verona, Italy to Baltimore, Maryland. (First Am. Compl. ¶ 6, ECF No. 15.) The plaintiffs arranged for a trucking company to transfer their cargo, including the cabinet, from Baltimore to Ontario, Canada, where they are located. (*See id.* ¶¶ 1, 6.) PAB and/or PAC operated as terminal operator in Baltimore. (*Id.* ¶ 7.) On or about December 11, 2014, at the Port of Baltimore, "while [PAB] and/or PAC transferred the Machine" to one of

1

the trucking company's flatbed trailers, the cabinet "fell on its side to the ground resulting in extensive damage" totaling $500,000. (*Id.* ¶¶ 8, 10.) The cabinet arrived at the plaintiffs' facility in damaged condition on December 16, 2014. (*Id.* ¶ 9.) The plaintiffs allege that PAB and/or PAC breached its duty to transfer the cabinet to the flatbed trailer "when its employees, agents and/or servants, through, *inter alia*, the use of defective lifting slings, improper rigging techniques and methods, and improper and/or lack of supervision of the lifting and transfer of the Machine caused the Machine to be dropped to the ground and extensively damaged." (*Id.* ¶¶ 12, 16, 23.)

On December 15, 2015, the plaintiffs filed a complaint against PAB only. (Compl., ECF No. 1.) On January 22, 2016, PAB filed a motion to dismiss or, in the alternative, a motion for summary judgment, alleging, *inter alia*, that the plaintiffs had sued the wrong party. (PAB Mot. Dismiss, ECF No. 9.) In particular, PAB stated that PAC—not PAB—contracted with the National Shipping Company of Saudi Arabia ("NSCSA" or "Bahri"), the carrier or vessel operator in this case, to provide stevedoring and marine terminal services for the vessel's cargo at the Port of Baltimore; discharged the cabinet from the vessel; and allegedly damaged the cabinet while loading it on to the truck. (*Id.* ¶ 2.) On February 9, 2016, the plaintiffs filed an amended complaint that named both PAB and PAC as defendants. (First Am. Compl.) The allegations of the amended complaint, now naming two defendants instead of one, remained largely the same. (*Id.*) On March 10, 2016, PAB and PAC filed a second, joint motion to dismiss or, in the alternative, for summary judgment (the "second motion"). (Second Mot. Dismiss, ECF No. 19.) In that motion, the defendants incorporate by reference PAB's original motion, and argue that PAB had no involvement in the damage to the cargo and should be dismissed from the lawsuit. (*Id.* ¶ 5.) The defendants also argue that, pursuant to the bill of lading between the

plaintiffs and Bahri, for which PAC acted as stevedoring firm and terminal operator, COGSA applies and the suit is barred by that law's one-year statute of limitations or, in the alternative, damages are capped by its $500 limitation of liability. (*Id.* ¶¶ 6-8.) The plaintiffs filed a response in opposition, (Resp. Opp'n, ECF No. 20), and the defendants replied, (Reply, ECF No. 21).

The court held a hearing on the pending motions on July 11, 2016. At that hearing, and in the supplemental briefing that followed, the defendants argued that, even if the services they provided at the time of the alleged loss were not covered by the bill of lading, they were covered by the terms of the BMTA Schedule, which also includes a one-year time bar and a $500 limitation on liability. (*See* Suppl. Mem., ECF No. 24.) The plaintiffs' response to the supplemental motion requested more time for discovery pursuant to Federal Rule of Civil Procedure 56(d). (*See* Suppl. Resp., ECF No. 27.) The defendants replied. (*See* Suppl. Reply, ECF No. 28.)

## STANDARD OF REVIEW

The defendants have moved to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Federal Rule of Civil Procedure 56. A court considers only the pleadings when deciding a Rule 12(b)(6) motion. Where the parties present matters outside of the pleadings and the court considers those matters, as here, the motion is treated as one for summary judgment. *See* Fed. R. Civ. P. 12(d); *Gadsby by Gadsby v. Grasmick*, 109 F.3d 940, 949 (4th Cir. 1997); *Paukstis v. Kenwood Golf & Country Club, Inc.*, 241 F. Supp. 2d 551, 556 (D. Md. 2003). "There are two requirements for a proper Rule 12(d) conversion." *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013). First, all parties must "be given some indication by the court . . . that it is treating the 12(b)(6) motion as a motion for summary

judgment," which can be satisfied when a party is "aware that material outside the pleadings is before the court." *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (internal quotation marks omitted); *see also Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998) (commenting that a court has no obligation "to notify parties of the obvious"). "[T]he second requirement for proper conversion of a Rule 12(b)(6) motion is that the parties first 'be afforded a reasonable opportunity for discovery.'" *Greater Balt.*, 721 F.3d at 281 (quoting *Gay*, 761 F.2d at 177). Here, the plaintiffs had adequate notice that the defendants' motion might be treated as one for summary judgment. The motion's alternative caption and attached materials are in themselves sufficient indicia. *See Laughlin*, 149 F.3d at 260-61. Moreover, the plaintiffs referred to the motion in their opposition brief as one for summary judgment and submitted additional documentary exhibits and a Rule 56(d) request. Therefore, the court will consider the affidavits and additional materials submitted by the parties and will treat the motion of the defendants as a motion for summary judgment.

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Henry v. Purnell*, 652 F.3d 524, 548 (4th Cir. 2011). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The court must view the evidence in the light most

4

favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam),

and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378

(2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562,

568-69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims

and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d

514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

## ANALYSIS

I.    PAB

As an initial matter, the defendants argue that PAB had no involvement in the alleged

negligence at issue and, therefore, should be dismissed from the case. In the original motion, as

incorporated in the second motion, Richard Surett, PAB's senior vice president, provided an

affidavit explaining that PAB is PAC's parent corporation, and that PAC, not PAB, provided the

cargo services related to the plaintiffs' cabinet.[1] (PAB Mot. Dismiss Ex. A, Surett Aff. ¶¶ 2-6,

ECF No. 9-2.) The defendants also attached to the second motion an affidavit from Jon Palmbak,

PAC's chief financial officer, attesting to the fact that PAC operated as stevedore and terminal

operator for NSCSA at the Port of Baltimore, and that it used a forklift to load the cabinet at

issue onto the flatbed truck. (Second Mot. Dismiss Ex. 1, Palmbak Aff. ¶¶ 4, 6, ECF No. 19-2.)

In their response in opposition, Lofthouse and Brawo do not provide any counter to the

argument that PAB is the wrong defendant. Because the plaintiffs have not responded to the

argument that PAB is not the responsible party, they have abandoned their negligence claim

against PAB. *See Wood v. Walton*, 855 F. Supp. 2d 494, 505 & n.35 (D. Md. 2012) (citing

*Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997)). Accordingly, the

---

[1] PAB's original motion to dismiss, which was filed before the plaintiffs' amended complaint, will be denied as moot. Because, however, the defendants incorporated into their second motion the original motion's arguments about whether PAB is the proper defendant, the court has considered the first motion for that purpose.

defendants' motion will be granted as to the claim that the plaintiffs have sued the wrong defendant, and PAB will be dismissed.

II.     Bill of Lading

The defendants argue that the plaintiffs' lawsuit is barred by the one-year statute of limitations in COGSA or, in the alternative, that the plaintiffs' damages are capped by that statute's $500 limit on liability.

COGSA governs the terms of bills of lading issued by ocean carriers engaged in foreign trade. 49 Stat. 1207, as amended, note following 46 U.S.C. § 30701 ("COGSA"). It contains certain defenses, including that "the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered."[2] COGSA § 3(6). It also contains a default limitation of liability for carriers of "$500 per package [or customary freight unit] . . . unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading."[3] COGSA § 4(5); *see also Schramm, Inc. v. Shipco Transp., Inc.*, 364 F.3d 560, 564 (4th Cir. 2004). Bills of lading may include Himalaya clauses, which extend COGSA's defenses and limits on liability to third-party agents of carriers, such as stevedores and terminal operators. *See Wemhoener Pressen v. Ceres Marine Terminals, Inc.*, 5 F.3d 734, 739, 740 (4th Cir. 1993).

By its terms, COGSA covers "the period from the time when the goods are loaded on to the time when they are discharged from the ship." COGSA § 1(e). The Harter Act, which was

---

[2] The bill of lading between Bahri and the plaintiffs also states that "the Carrier, Vessel Owners, operators, managers or Sub-Contractor, [defined to include terminal operators and stevedores], shall be discharged from all liabilities whatsoever unless suit is brought within one year from the date that the Goods have been delivered or when the Goods should have been delivered." (Second Mot. Dismiss Ex. 4 p. 5, Bill of Lading § 17, ECF No. 19-5.)
[3] The bill of lading at issue also includes a $500 limit on liability, and the plaintiffs did not declare an alternative value for the cargo. (Bill of Lading § 9(a), (b).)

6

superseded in large part by COGSA, still applies "prior to the time when the goods are loaded on or after the time they are discharged from the ship," *Schramm, Inc.*, 364 F.3d at 565 (citation omitted), and its application extends until "proper delivery," 46 U.S.C. § 30704. "The 'discharge' of goods from a vessel thus marks the transition of coverage from COGSA to the Harter Act, unless the parties have agreed to extend COGSA, and the Harter Act then applies until delivery is made." *Schramm, Inc.*, 364 F.3d at 565. The Harter Act permits limitations, although not complete absolutions, of liability. *See Wemhoener Pressen*, 5 F.3d at 739.

The parties in this case appear to agree that the bill of lading between Bahri and Lofthouse, the company listed in the document as the consignee or merchant, extended COGSA to the statutory limit of the Harter Act, or the point of "proper delivery,"[4] and that the bill's Himalaya clause would reach any PAC conduct that occurred before "proper delivery" while COGSA still applied.[5] (*See* Second Mot. Dismiss Ex. 1, Mem. Law 10-11, ECF No. 19-1; Resp. Opp'n 3.) The issue, therefore, is when "proper delivery" occurred. If delivery was complete before the cabinet was damaged, COGSA would not apply and PAC would not be entitled to invoke the law's statute-of-limitations or limitation-of-liability defenses. If delivery had not yet occurred at the time the cabinet was tipped over, COGSA would apply and the plaintiffs would be precluded from bringing this suit.[6] "Proper delivery" for Harter Act purposes means "either actual or constructive delivery. Actual delivery consists [of] completely transferring the

---

[4] The bill of lading states that "the Carrier shall be liable from the time [] the Goods are received at the loading port until the time the Goods have been *delivered* to the Merchant at the Port of Discharge." (Bill of Lading § 5(a) (emphasis added).)

[5] The bill's Himalaya clause states that "[i]f any litigation or claim is brought against the Vessel owners, operators, managers or Sub-Contractor, [defined to include stevedores and terminal operators], employed by the Carrier to perform this contract of carriage, such a person shall be entitled to the defenses and limits of liability which the Carrier is entitled to invoke under this contract." (Bill of Lading § 4(b).)

[6] The plaintiffs appear to concede that their claim is barred if COGSA applies, even if their amended complaint relates back to the date of their original pleading. (*See* Resp. Opp'n 2 ("If the Cargo was damaged at a point in time that COGSA was applicable, then the Defendants' motions should be granted.").) Accordingly, it is unnecessary for the court to address whether the amendment relates back.

possession and control of the goods from the vessel to the consignee or his agent. Constructive delivery occurs where the goods are discharged from the ship upon a fit wharf and the consignee receives due and reasonable notice that the goods have been discharged and has a reasonable opportunity to remove the goods or put them under proper care and custody." *Wemhoener Pressen*, 5 F.3d at 741-42 (alteration in original). The Harter Act "establishes the minimum requirements, but parties are free to contract for further obligations." *Id.* at 742.

The court cannot say there is no genuine dispute about whether the bill of lading covered PAC's services at the time the cabinet was damaged. As an initial matter, the court disagrees with the defendants' contention that the bill of lading clearly requires "actual," and not "constructive," delivery. Section 5 states that the carrier shall be liable "until the time the Goods have been delivered to the Merchant at the Port of Discharge," and Section 17 states that a merchant must provide notification if it "wishes to have a damage survey after taking delivery of the Goods from the discharge terminal," but neither section defines the term "delivery." (Bill of Lading §§ 5, 17.) The defendants also emphasize the "custody" language of Section 16, which states that, "[u]nless notice of loss of or damage to the Goods . . . be given in writing to the Carrier at the place of delivery before or at the time of the removal of the Goods into the custody of the person entitled to delivery . . . , such removal shall be prima facie evidence of the delivery by the Carrier of the Goods in good order." (Bill of Lading § 16.) But the Fourth Circuit's definition of constructive, not actual, delivery uses the "custody" language. Further, Section 16 also says that notice may be given *before* goods are removed into the custody of the person entitled to delivery, potentially suggesting the possibility of constructive delivery. (*Id.*)[7]

---

[7] Even if the bill of lading required actual delivery, the court cannot be sure from the photograph provided by the defendants that actual delivery had not occurred when the cargo was damaged. (Second Mot. Dismiss Ex. 4 p. 3, Photograph, ECF No. 19-5.)

Further, there are genuine disputes about when delivery occurred. In particular, it appears that the cabinet was damaged while PAC loaded it onto the flatbed truck of Convoy Logistics Providers ("Convoy"), the trucking company the plaintiffs hired to transport the cargo from Baltimore to Ontario.[8] PAC sent an invoice to Convoy, requesting $435.59 for delivering the cargo listed in the bill of lading at issue. (Resp. Opp'n Ex. 2, Invoice, ECF No. 20-2.) If PAC was operating on Bahri's behalf during the loading process, it should be protected by COGSA's defenses. If PAC was operating on Convoy's behalf, however, it seems likely that delivery already had occurred when the cargo was damaged.[9]

The Fourth Circuit cases to which the defendants cite do not resolve this dispute. In *Wemhoener Pressen*, *Koppers*, and *B. Elliott*, the Fourth Circuit emphasized that the respective stevedoring firms were acting on behalf of the carriers, and not the consignees, when the cargo was damaged. *See Wemhoener Pressen*, 5 F.3d at 736, 742 (noting that the service the terminal operator was undertaking when the cargo was damaged was charged to the carrier); *Koppers Co., Inc. v. S/S Defiance*, 704 F.2d 1309, 1312 (4th Cir. 1983) (The carrier "gave [the terminal operator] all instructions relative to the handling of the cargo prior to any delivery to the overland trucker. Under these circumstances, it is clear that [the terminal operator] was [the carrier's] agent."); *B. Elliott (Canada) Ltd. v. John T. Clark & Son of Md., Inc.*, 704 F.2d 1305,

---

[8] The amended complaint, for example, states that the cabinet was damaged "*while* [PAB] and/or PAC transferred the Machine to a flat bed trailer." (First Am. Compl. ¶ 8 (emphasis added).) A handwritten note in the dock receipt, which was signed by Convoy's driver, states that the "case tipped over to the ground *while* loading." (Second Mot. Dismiss Ex. 4 p. 2, Dock Receipt, ECF No. 19-5 (emphasis added).) And Convoy, presumably acting as Lofthouse's agent, sent PAC a "letter of intent to claim" stating that the crate that contained the cabinet "likely sustained damage *during* [the] loading process at Dundalk Marine Terminal on December 12 as witnessed by the truck driver." (*Id.* Ex. 4 p. 1, Letter of Intent to Claim, ECF No. 19-5 (emphasis added).)
[9] At oral argument and in their response to the supplemental briefing, the plaintiffs produced a copy of a fax from Klaus Joerg, senior project manager at Convoy, to a customer service account at "Ports America," in which Joerg requests "loading appointments for the 3 trailer loads" and writes: "All your terminal and truck loading charges for account of Convoy Logistics." (Skeen Aff. Ex. A, Fax, ECF No. 27-1.) The subject line of the fax references the bill of lading between Bahri and Lofthouse. (*Id.* ("RE: loading appointments / crane scheduling B/L NSAUJZ004LVBA012").) The document, however, indicates no date or time, is addressed to an unknown customer service account at "Ports America," and includes no response. It, therefore, cannot alone resolve the question whether PAC was operating on Convoy's behalf when the cargo was damaged.

9

1307 (4th Cir. 1983) ("[The merchant] concedes that [the stevedore] was the agent of [the carrier]"); *id.* at 1308 ("At no time did [the merchant] contact [the stevedore] with instructions regarding the care and handling of the cargo. All instructions relating to [the stevedore's] activities were received directly from [the carrier]."). In *Schiess-Froriep Corp. v. S. S. Finnsailor*, the Second Circuit remanded the case back to the district court because, *inter alia*, "[n]either party submitted any evidence to the district court regarding [the terminal operator's] status while engaged in loading the delivery truck," and "neither attorney was able to inform the court who was paying [the terminal operator] for its truck-loading services or whether a separate contract had covered this work." 574 F.2d 123, 126, 127, 128 (2d Cir. 1978). And in a case remarkably similar to this one, where the terminal operator separately invoiced the merchant approximately $326 for loading crates onto a truck that the merchant sent to the terminal facility, a court in the Southern District of New York found that the bill of lading did not apply because the stevedore "was not acting as a servant, agent, or subcontractor of [the carrier] when it loaded the truck." *Komori Am. Corp. v. Howland Hook Container Terminal, Inc.*, 1998 WL 614194, at *4 (S.D.N.Y. Sept. 14, 1998).[10]

In *B. Elliott*, the Fourth Circuit held that the "pier to pier" designation in that case's bill of lading required the carrier "to have the cargo removed from the container and placed in or on the overland truck." 704 F.2d at 1308. At oral argument, the defendants contended that the term "port to port," which appears in Section 5(a) of the bill of lading in this case, has the same meaning. The defendants represented that cases dealing with "port to port" bills of lading cite to cases addressing "pier to pier" bills of lading. Although this may be true, it appears that "port to port" may simply extend COGSA's application until delivery, without providing a definition of "delivery." In one of the cases cited by the defendants at the motions hearing, for example, the

---

[10] Unpublished opinions are cited for the soundness of their reasoning, not for any precedential value.

court in fact found that the plaintiff had failed to prove that the term "port to port"—which, as in this case, appeared as the heading to Subsection 5(a) of an NSCSA bill of lading—determined the point at which delivery occurred. *Crompton Greaves, Ltd. v. Shippers Stevedoring Co.*, 921 F. Supp. 2d 697, 726 & n.10 (S.D. Tex. 2013). The court instead held that the term simply meant that the carrier's responsibility was extended "beyond discharge." *Id.* at 726 n.10. Likewise, in another case cited by the defendants at the hearing, the court simply said that "port to port" movement meant that the carrier was responsible for the cargo until it was "delivered" to the consignee. *Compania Chilena De Navegacion Interoceanica, S.A. v. D.H.C. Trucking, Inc.*, 2016 WL 1722425, at *1 (S.D. Fla. Apr. 29, 2016). And in *Suzlon Wind Energy Corp. v. Shippers Stevedoring Co.*, the court looked to the facts of the case and which party was responsible for the cargo when it was damaged to determine whether delivery occurred under a "port-to-port" bill of lading. *See* 2008 WL 686206, at *18 (S.D. Tex. March 7, 2008). Accordingly, use of the phrase "port to port" in the bill of lading does not require judgment in favor of PAC.

Because there is a genuine dispute about whether the bill of lading covered PAC's services at the time the cabinet was damaged, the defendants' motion for summary judgment on that ground will be denied.

III.      BMTA Schedule

At oral argument on July 11, 2016, the defendants argued for the first time that, even if the services PAC provided at the time of the alleged loss were not covered by the bill of lading, they would be covered by the BMTA Schedule, which also includes a one-year time bar and $500 limitation on liability. The court ordered supplemental briefing on this issue.

A marine terminal operator's schedule, such as the BMTA Schedule, may include "limitations of liability for cargo loss or damage" and, if it is made available to the public, the

11

schedule "is enforceable by an appropriate court as an implied contract without proof of actual knowledge of its provisions." 46 U.S.C. § 40501(f); *see also* 46 C.F.R. § 525.2(a)(2) ("Any schedule that is made available to the public by the marine terminal operator shall be enforceable by an appropriate court as an implied contract between the marine terminal operator and the party receiving the services rendered by the marine terminal operator, without proof that such party has actual knowledge of the provisions of the applicable terminal schedule."). The Code of Federal Regulations, however, clarifies that, "[i]f the marine terminal operator has an actual contract with a party covering the services rendered by the marine terminal operator to that party, an existing terminal schedule covering those same services shall not be enforceable as an implied contract." 46 C.F.R. § 525.2(a)(3). Here, the plaintiffs do not appear to contest that the BMTA Schedule had been made public and was in effect before the cargo was damaged, (*see* Palmbak Suppl. Aff. ¶¶ 3-4, ECF No. 24-2), or that it includes a $500 limitation of liability and a one-year time bar, (*see* BMTA Schedule Rule 34-2(2), (5), ECF No. 24-3). Accordingly, the applicability of the BMTA Schedule turns on whether there was an "actual contract" between PAC and Convoy.

The plaintiffs represent that "[f]acts and documents needed to determine whether there was an actual contract between Convoy and Ports America are not available to plaintiffs as Convoy has not agreed to voluntarily produce them."[11] (Suppl. Resp. 2.) Accordingly, they have requested additional time either to obtain consent from Convoy or subpoena Convoy to testify and produce documents at deposition. (*Id.*) Federal Rule of Civil Procedure 56(d) states that, "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present

---

[11] At oral argument, plaintiffs' counsel represented that he was not aware of any contract between Convoy and PAC beyond the invoice and fax he had produced. Given that the summary judgment standard favors the plaintiffs as the nonmoving party, no discovery has occurred, and the applicability of the BMTA Schedule was raised for the first time at the hearing, the court will not treat counsel's statement as an admission.

facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Rule 56(d) motions with supporting affidavits are "broadly favored and should be liberally granted because the rule is designed to safeguard non-moving parties from summary judgment motions that they cannot adequately oppose." *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013) (citation omitted). Additionally, "[a] Rule 56(d) motion must be granted 'where the nonmoving party has not had the opportunity to discover information that is essential to his opposition.'" *McCray v. Md. Dep't of Transp.*, 741 F.3d 480, 483-84 (4th Cir. 2014) (quoting *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002)). But if the additional evidence that would be gained from discovery would not itself create a genuine issue of material fact, the Rule 56(d) motion should be denied. *See Strag v. Bd. of Trs.*, 55 F.3d 943, 954 (4th Cir. 1995).[12]

Here, the plaintiffs' Rule 56(d) request is supported by the affidavit of James D. Skeen, the plaintiffs' attorney, along with attached exhibits documenting their unsuccessful attempts to obtain information from Convoy about an "actual contract" between the trucking company and PAC. The combination of (a) PAC's invoice, even if in line with the rates in the BMTA Schedule, (b) the fax that states that the terminal and truck loading charges associated with the bill of lading at issue should be charged to the "account of Convoy Logistics," and (c) the fact that the plaintiffs are requesting discovery on the discrete issue of whether an actual contract existed, is enough to persuade the court that the Rule 56(d) request is not simply a fishing expedition. *See Adams v. Giant Food, Inc.*, 225 F. Supp. 2d 600, 607 (D. Md. 2002) ("The

---

[12] The court notes that, in arguing that the plaintiffs have not met the Rule 56(d) standard, the defendants cite several cases outside the Fourth Circuit. (*See* Suppl. Reply 5-6.) Further, several of the Fourth Circuit cases on which the defendants rely—*Harrods Ltd.*, 302 F.3d at 244, *Y.B. v. Bd. of Educ. of Prince George's Cty.*, 895 F. Supp. 2d 689, 702 (D. Md. 2012), and *Nautilus Ins. Co. v. REMAC Am., Inc.*, 956 F. Supp. 2d 674, 683 (D. Md. 2013)—dealt with instances where the nonmoving party did not file a Rule 56(d) affidavit.

purpose of [Rule 56(d)] is not to allow the non-moving party to engage in a fishing expedition."). Although it is true that, as in the *Fortis* case cited by the defendants, the invoice rate matches the rate listed in the BMTA Schedule, (*see* Invoice (listing the rate as $19.69); BMTA Schedule Rule 34-6(2)(A)(2) (listing $19.69 per net ton as the price for loading or unloading "pre-palletized and skidded and unitized cargo"), a fact which ultimately may become determinative, it is also true that, unlike in *Fortis*, the plaintiffs have not had the opportunity to determine through discovery whether there is evidence of an actual contract separate from the BMTA Schedule. *See Fortis Corp. Ins., Co. v. M/V Lake Ontario*, 2005 WL 3710253, at *6 (N.D. Ind. March 8, 2005). Instead, discovery on the specific issue of whether an actual contract existed could produce facts necessary for the plaintiffs to prove their case, or at least create a genuine dispute sufficient to overcome a motion for summary judgment. Further, the court is not convinced that any information about an actual contract has been at the plaintiffs' disposal throughout the course of this litigation. *See McCray*, 741 F.3d at 484 ("[N]onmovants do not qualify for Rule 56(d) protection where they had the opportunity to discover evidence but chose not to."). There is no dispute that the plaintiffs hired Convoy to transfer their cargo. At oral argument, however, the plaintiffs represented that Convoy is an independent contractor, and the exhibits attached to Skeen's affidavit support the plaintiffs' contention that they have been trying, but have been unable, to obtain documents from the company. And in his affidavit, Skeen avers that communications in this case were through the plaintiffs' Canadian counsel, from whom he received a copy of the fax, and that he reached out to Convoy directly only after the July 11 hearing. (Skeen Aff. ¶¶ 3, 4.)

Accordingly, PAC's motion for summary judgment will be denied without prejudice, and the plaintiffs' Rule 56(d) request will be granted as to the limited issue of whether an "actual contract" existed.

**CONCLUSION**

For the reasons stated above, the first motion to dismiss or, in the alternative, for summary judgment will be denied as moot, and the second motion will be granted in part and denied without prejudice in part. Counsel will be contacted to set a schedule for limited discovery. A separate order follows.


    9/7/16                              /s/
Date                                 Catherine C. Blake
                                 United States District Judge